UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
----------------------------------------------------------X
MICHAEL BORLET,

                        Plaintiff,                      **Docket No.:**

    -against-                           **COMPLAINT**

BECTON, DICKINSON,                  **JURY TRIAL**
AND COMPANY,                      **DEMANDED**

                      Defendant.
----------------------------------------------------------X

## CIVIL ACTION COMPLAINT

      COMES NOW Plaintiff, by and through counsel, Parlatore Law Group, LLP

and Complains of the Defendant as follows:

### I.      Introduction

1.     Plaintiff initiates this action to seek redress against the Defendant, his

former employer, for violations of the Americans with Disabilities Act ("ADA"),

the New Jersey Law Against Discrimination, N.J.S.A. § 10: 5-12, *et seq.,* and other

applicable law.

### II.      The Parties

2.     Plaintiff, Michael Borlet, is an adult individual currently residing in the

State of Maryland.

3.     Defendant, Becton, Dickinson and Company, is a corporation, created

and existing pursuant to the laws of the State of New Jersey and registered to

conduct business in the State of New Jersey, with a place of business located within the State of New Jersey.

4.     At all times relevant, Defendant acted by and through its agents, servants, and employees, each of whom, at all times relevant, acted within the scope of his or her job duties.

5.     Defendant is an "employer" within the meaning of the Americans with Disabilities Act ("ADA") because it is engaged in an industry affecting commerce and because it maintains or maintained fifteen (15) or more employees for each working day in each of twenty (20) or more calendar weeks in the current or preceding calendar year.  At all times relevant, Defendant maintained more than 500 employees.

6.     The Defendant also maintains a sufficient number of employees to satisfy the jurisdictional prerequisites of the New Jersey Law Against Discrimination ("NJLAD") (requiring one or more employees).

7.     At all times relevant, Plaintiff suffered from Post-Traumatic Stress Disorder (PTSD), a recognized "disability" within the meaning of the ADA.

### III.     <u>Jurisdiction and Venue</u>

8.     The United States District Court for the District of New Jersey may exercise original subject-matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises under the laws of the United States

and seeks redress for violations of civil rights.

9.      Venue is properly laid in the District of New Jersey pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2) because the Defendant is located in and conducts business in this judicial district and because a substantial part of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district. The Plaintiff was employed by Defendant at the time of each of the illegal actions set forth herein and commuted into the District of New Jersey for employment purposes at the time of many of the illegal actions set forth herein.

## IV.   <u>Procedural and Administrative Remedies</u>

10.   The Plaintiff has satisfied the procedural and administrative requirements for proceeding under the ADA and NJLAD as follows:

   a.   On or about September 16, 2019, Plaintiff filed a timely written charge of discrimination (No. 531-2019-03765) against the Defendant with the Baltimore office of the Equal Employment Opportunity Commission in his home state of Maryland, alleging disability discrimination and retaliation;

   b.   On or about April 28, 2020, the EEOC issued a Notice of Right to Sue to Plaintiff;

   c.   The instant action is timely because it is initiated within ninety (90) days of the receipt of the aforementioned Notice; and

d. The Plaintiff also cross-filed the aforementioned charges of discrimination and retaliation with the New Jersey Division on Civil Rights.

11.    The Plaintiff has exhausted his administrative remedies as to the allegations of this Complaint.

## V.    Factual Background

12.    Plaintiff Michael Borlet ("Borlet") is a decorated combat veteran of the United States Army, who served in the Persian Gulf War in Kuwait as a Tank Platoon Leader.  Borlet was honorably discharged from the armed services following his service overseas.  Borlet was awarded the Bronze Star with "V" device for extraordinary heroism during his actions in Kuwait in defense of the interests of the United States of America.

13.    Borlet worked for Defendant Becton, Dickinson and Company ("BD") for a cumulative period of fifteen and one half years.

14.    Borlet began working for a subsidiary of BD in January of 1998.

15.    Borlet left his position with Defendant BD and took managerial positions in other companies within the industry over the next several years.

16.    Between June 2003 and April 2006, Borlet held the position of Senior Marketing Manager and Group Marketing Manager at BD Diagnostics

17.    Between April 2006 and April 2007, Borlet held the position of

Worldwide Vice President of Sales and Marketing at Vistalabs Technology

18.     Between April 2007 and February 2010, Borlet held the position of Director of Marketing and Sales at Baxter Healthcare.

19.     In February of 2010, Borlet was rehired by BD in the position of Senior Director of Marketing – PreAnalytical Systems at BD and held that position until April 2011.

20.     In April of 2011, Borlet was promoted to World-Wide Platform Leader: Sepsis, ID/AST, TB, Informatics at BD, and held that position until May of 2012.

21.     In May of 2012, Borlet was again promoted, to Vice President of Sales at BD, and remained in that position until September of 2014.

22.     In October of 2015, Borlet was promoted to the position of Vice President/General Manager ("VP/GM") US Diagnostics at BD. As the VP/GM, Borlet's job description included driving profitable sales by developing and implementing all customer interfacing teams, including Sales, Marketing and the Service Organization. Borlet was responsible for over 300 associates and $600 million in annual revenue.  In 2015 and 2016, Borlet received very favorable performance reviews in this position and was described as having high potential for future promotions.

23.     In July of 2016, Borlet was asked to take over as VP/GM of

Medication and Procedural Solutions (MPS) in New Jersey for BD. His job responsibility again was to drive profitable sales by developing and implementing all customer interfacing teams, again including Sales, Marketing and the Service Application Organization. In this position, Borlet was responsible for over 400 associates and approximately $1 billion in annual revenue. Borlet commuted from his home state of Maryland to fill this position until February of 2018.

24.     In February of 2018, Borlet was demoted to the role of Group Vice President, Strategic Customer Group Non-Acute at BD, managing a handful of people, as a direct result of the improper and illegal conduct of his supervisor and the detrimental effect of that conduct on Borlet's PTSD symptoms.

25.     In 2016 and early 2017, while he was in the role of VP/GM of MPS, a business unit of Defendant BD, Borlet had been under the direct supervision of James Condie and William Tozzi. Condie wrote glowing reviews of Borlet's performance in the VP/GM role at MPS; Tozzi's verbal feedback was equally positive.

26.     In April of 2017, Alexandre Conroy took over as the Business Unit supervisor at MPS, putting him in a position of indirect supervision of Borlet.

27.     BD maintains a written policy which strictly prohibits and does not tolerate harassment, discrimination, bullying or retaliation by any BD associate or managerial employee.

28.     BD's internal policy, consistent with the ADA, defines harassment as any unwelcome conduct, based upon a Protected Characteristic or otherwise, that interferes with work performance, or creates an intimidating, hostile, or abusive working environment.

29.     BD's policy defines bullying as the persistent and malicious demeaning or downgrading of a person through words or actions that undermine self-confidence or self-esteem. Examples supplied by BD's policy include repeated derogatory comments, personal insults or epithets, verbal or physical conduct that a reasonable person would find threatening, intimidating, or humiliating, or the malicious sabotage of a person's performance.

30.     In 2016, in his previous position, Conroy was Borlet's senior rater.  For his 2016 performance appraisal, Conroy rated Borlet a 5 out of 5 and Consistently Exceeding Expectations. Conroy also rated Borlet as a high potential employee.

31.     However, upon his arrival at MPS in April of 2017, Conroy commenced a campaign of bullying, ostracizing, intimidating  and humiliating  Borlet, including berating him in front of other BD employees and excluding him from meetings at which a VP/GM's attendance would be expected and required. During Conroy's first days in his new position he informed Borlet that Borlet would not be considered for further promotion even though Borlet was on a short list of candidates for Business Unit Presidents, and in spite of the fact that six months

earlier he had ranked Borlet as a high potential employee. When Borlet asked if others shared this view, Conroy answered by saying that he was now the Chair for the team selecting future Business Unit Presidents and that he would run all future meetings when selecting Business Unit Presidents.

32.     On another occasion, during a staff meeting Conroy said that he did not have faith that Borlet was managing his team at the level expected of a VP/GM. Conroy then required Borlet to give a presentation on how he was managing the region. No other staff member or Regional leader was required to give a similar presentation. Before giving the presentation, Borlet reviewed it with Condie, who said it was excellent and clearly demonstrated that he was managing the region at a high level.  However, when Borlet was actually giving the presentation Conroy continuously interrupted and repeatedly stated that Borlet was not managing the region at an acceptable level. As an example of this supposedly poor performance, Conroy complained that Borlet did not have the US Marketing team on a compensation plan but was instead using the company performance incentive plan. Borlet immediately asked for clarification from the VP for World Wide Marketing, who was on the phone during the presentation. She clarified to Conroy that BD did not have *any* Marketing teams on compensation plans. At the end of the meeting, Conroy announced to Borlet and the others in attendance that Borlet was not acting at the level of a VP/GM and that he scored Borlet as 1.5 out 5. Following

this presentation, as well as other instances of similar conduct, Condie told Borlet that BD management would reach out "again" to Conroy and ask him to stop the bullying behavior.

33.     Throughout April and May of 2017, Conroy continued to bully, humiliate, and maliciously sabotage Borlet's work and performance.  Conroy excluded Borlet from meetings and strategy sessions on a regular basis, making it difficult for him to perform the duties of his position.  Borlet was particularly affected by this behavior because not only did it prevent him from performing his job effectively, it also triggered the Post-Traumatic Stress Disorder (PTSD) originally caused by Borlet's wartime service in the military.

34.     Borlet had been diagnosed with PTSD and was undergoing treatment for that condition before being bullied by Conroy in 2017 and has continued to undergo treatment through the present date. Borlet's PTSD diagnosis was also evaluated and confirmed by the US Veteran and Health Administration. Borlet has a disability rating of 70% based on his PTSD diagnosis.

35.     Borlet spoke to James Condie, Manish Sinha, and the Human Resources department at MPS in June of 2017 about Conroy's ongoing treatment of him and the negative effect that it was having on his health.  Borlet specifically disclosed the fact that he suffered from PTSD which was being negatively impacted by Conroy's behavior to Condie and to Thomas Polen, who was Conroy's superior.

9

36.     In June of 2017, Borlet met with James Condie for dinner and disclosed his PTSD diagnosis, how hard he had worked in treatment to control his symptoms, and the extreme negative impact that Conroy's ongoing conduct was having upon his health. Condie claimed to be sympathetic and offered three possible "solutions:" "fight" Conroy; quit his job with a severance package; or accept a demotion that would remove him from the bullying environment.  Borlet agreed to accept a demotion as the only possible option offered to him that might not have a further negative effect upon his health.

37.     In spite of the serious and ongoing impact on his health, Borlet was asked by both Condie and Polen to remain in his then-current position until the end of the fiscal year in September, which he reluctantly agreed to do.

38.     In late August/early September of 2017, while annual performance reviews were being drafted, James Condie informed Borlet that Conroy wanted to give him an unsatisfactory grade on his evaluation but that Condie did not think that was appropriate as Borlet was doing an excellent job in the position. Condie told Borlet that Conroy was working hard to discredit Borlet's work to BD senior management.  Borlet stated that if he received an unsatisfactory grade, he would notify the Board of Directors of BD that not only was he being bullied, but that he was being required to stay in his position while being bullied and receiving undeserved negative reviews as a result.  Condie then spoke to Thomas Polen, and

Borlet subsequently received a performance review which contained a complimentary writeup in the performance appraisal section and overall stated that he met expectations in his position.

39.     In September of 2017, following the performance reviews, Polen asked Borlet to remain in his position as he was doing "a great job," and BD really needed him to stay in the position.   Borlet informed Polen that due to the bullying behavior of Conroy – which was still ongoing – and specifically because of its detrimental effect on Borlet's health due to his PTSD, he was unable to stay in the VP/GM position.  Polen then agreed to let Borlet transfer out of the position because it was harmful to his health but required him to stay in his role until they were able to find a replacement.

40.     Borlet was not allowed to transition out of the role in which he directly reported to Conroy until February of 2018, in spite of the ongoing detrimental effects on his health; nor did BD do anything during this time period to reduce the effects of Conroy's conduct or to even attempt to reprimand Conroy for his behavior.

41.     In March of 2018, Borlet met with Polen in the BD Maryland office. During that meeting, Polen confirmed that Borlet had excelled in all of his leadership roles, and that Borlet's best performance was as the VP/GM of MPS in spite of Conroy's ongoing bullying and harassment.    They discussed the effect

Conroy's behavior had on Borlet's health due to his disability, and Polen claimed that BD had assigned a coach to Conroy due to his behavior in bullying not only Borlet, but others as well. Polen also asked Borlet to meet with him at a later date to give him more details about Conroy's bullying. Unfortunately, although Borlet tried multiple times after this to meet with Polen, he was not able to get Polen to engage in a follow-up meeting.

42.     In August of 2018, Borlet was asked to update his career goals at BD. At that time Borlet reaffirmed that his goal was – as it had been before the detrimental behavior of Conroy – to fulfill the role of World Wide VP/GM and then to be a Business Unit President within the BD organization.

43.     In November of 2018, Borlet received his performance review for the 2018 fiscal year; although he was rated as having met expectations in his then-current role of VP, he did not receive the full bonus or stock options that he would ordinarily receive.  The verbally stated reason given was that MPS, where Borlet remained as VP/GM until February of that year at Polen's insistence, did not meet its revenue targets during the five months that Borlet was managing the region as the VP/GM.  However, when Borlet left that role, MPS was actually $17.5 million dollars over its revenue target. It was also disclosed to Borlet that the lower bonus and stock options had been designated for him specifically by higher management at BD.

44.     In January of 2019, the position previously held and excelled in by Borlet before his transfer to MPS – that of VP/GM of US Diagnostics – became available. Borlet immediately informed Condie, who was designated as the hiring manager for the position, that he wanted to apply for the job.  Condie responded that Borlet would never be hired for that role because the "higher ups" had been told *by Condie* that Borlet had left MPS to achieve a "better work/life balance" and that as a result of this false story, Borlet would never again be promoted to an upper management position. Borlet, upset that his future within the company could be impacted by a false story, immediately asked Condie to go back and notify upper management of the real reason for his demotion – the bullying behavior of Conroy and its effect on his PTSD. Borlet told Condie that if the truth was not told, he would have to go to the BD Ethics department. Although Condie said he could not prevent Borlet from filing an ethics complaint, he advised Borlet that nothing would come of it as Polen was "afraid" of Conroy and Conroy was protected at the highest levels within BD.  Condie said that even though Conroy was a well known bully at BD that the most that would happen would be that he would get his hands slapped but would still stay in his position and keep his bonuses and stock. Borlet ended the call by telling Condie that he was still planning on interviewing for the new opening.

45.     Following this conversation, in February of 2019, Borlet met with Nicole

Thompson, Senior Director of Human Resources for the US and Canada, to confirm that he wanted to interview for the VP/GM position.  Borlet asked to interview with the World Wide President of US Diagnostics, Dave Hickey, and Condie in his role as hiring manager, rather than the full panel interview, so that he could disclose his PTSD and the true reasons for his departure from the MPS VP/GM position.   Thompson rejected this request for a reasonable accommodation, stating that Borlet would have to interview in front of the full panel if he wanted the job.  When Borlet became emotional and shared that having to undergo this type of conversation in front of multiple people would be a trigger of his PTSD and would result in a poor and unfair interview, Thompson persisted in refusing his request and claimed that there were no alternatives. Thompson told Borlet that he would need to interview with the full panel and, further, would be required to explain his demotion.

46.    In March of 2019, Thompson again met with Borlet and told him that she still maintained that he could only interview for the US Diagnostics position in front of the full panel. A smaller panel interview was not an option.  She also recommended that Borlet contact the Ethics Department about the bullying behavior of Conroy. Borlet told Thompson that he was concerned about retaliation, as the matter now involved multiple high-level BD executives. Borlet and Thompson agreed that she would file the complaint and that Borlet would then be

available to give the facts to the Ethics Department  Thompson then repeated her refusal of Borlet's request for a reasonable accommodation of a smaller interview and did not engage further with Borlet to find an accommodation that would be acceptable to BD without negatively impacting Borlet's disability and health.

47.    Borlet notified both Condie and his then-current supervisor, Steve Gunderson, that he had requested a reasonable accommodation in order to interview and that Thompson had denied the request.  When both men stated that they would back Thompson, Borlet specifically reminded them that the ADA requires employers to engage with disabled employees in order to accommodate their disabilities.  Both Condie and Gunderson continued to support Thompson's position that the only way to interview for the VP/GM position was in front of the full interview panel.  Condie further warned Borlet that by interviewing and revealing what had happened to lead to his demotion, it would "get out" that Borlet had PTSD to a large group at BD and become common knowledge.

48.    Both Condie and Gunderson hold managerial positions at BD that require annual training on discrimination, appropriate workplace behavior, and ADA compliance.  Further, BD maintained written policies on these issues.  It was clear, however, from their reactions to Borlet's situation and to his specific references to the ADA that neither individual understood their obligations or the obligations of BD to comply with the law, thus showing that BD's training and

policies were insufficient to comply with the ADA.

49.    Borlet informed both Condie and Gunderson that he wanted to interview for the position but that he could not do so without some reasonable accommodation for his disability.  Borlet also told both men that if it was already a forgone conclusion that he would not get the job, there was no point in his going through a full panel interview that could negatively impact his health without any possibility of promotion.  He continued, however, to express interest in the position, which was one in which he had previously excelled.

50.    BD conducted full-panel interviews of other individuals for the position sought by Borlet through June of 2019, at which time, they canceled the job opening and created a new position entitled U.S. VP/GM of Integrated Diagnostics.  The job duties and requirements remained similar to those of the US Diagnostics position.  Borlet again expressed his interest and asked to interview. Borlet asked Thompson why he was not being considered for the position. Borlet said that if there was any negative feedback he would like to address the matter and was open to ideas regarding any reasonable accommodation if the reason was related to his disability. Borlet asked the same question of Christopher Andreychak of the BD Ethics Office, who had been assigned to investigate the complaint made by Thompson at Borlet's request. Weeks later, Borlet was notified by Andreychak that he would not be allowed to interview because he had not met expectations in

the VP/GM role at MPS.

51.     Borlet reminded Thompson and Andreychak that his performance reviews stated that he had, in fact, met expectations while at MPS, and that his performance appraisal reviews from Condie and Polen had been highly complimentary. Indeed, both men had asked him to stay in the position in spite of Conroy's bullying and intimidation. At that point, Thompson stopped referring to reviews and instead stated that no interviews would be held for the new Integrated Diagnostics position. Kate Benedict, who did not have the same level of experience or qualifications as Borlet, was selected by BD for the Integrated Diagnostics VP/GM position and Borlet was never given an opportunity to interview.

52.     Between April and July of 2019, Borlet had several interactions with the BD Ethics Office, specifically Andreychak. Borlet repeatedly attempted to meet with Andreychak to explain in detail the bullying behavior of Conroy and to discuss reasonable accommodations for future potential promotions, but was denied meetings on all but the initial 30 minute phone interview. Eventually, Andreychak told him that both Conroy and Polen had both been "counseled" as a result of their roles in the bullying that took place while Borlet was at MPS, implying that BD had found evidence to substantiate Borlet's position. Borlet then asked if he could still provide his own evidence of bullying for the record.

Andreychak stated it was not needed and analogized the situation to arresting a serial killer, saying that you need only prove one murder and the person would go to jail for life. He said to Borlet that they had proved the one murder and no more evidence was needed. Andreychak then went on to say that the actual findings were confidential and could not be discussed, but that action was being or had been taken by BD.  Throughout these interactions and in spite of Borlet's multiple requests, Andreychak did not offer any accommodation, reasonable or otherwise, that would have enabled Borlet to interview for upper-management positions as they became available.

53.    In June of 2019, while being prevented from interviewing for the Integrated Diagnostics position, Borlet approached Sam Kochi, Esq., Counsel for BD.  Borlet contacted Kochi because not only was Kochi Head of the Ethics Committee, and therefore Andreychak's supervisor, but he also served as Chair of the Veterans Group and Co-Chair of the group for workers with disabilities at BD. Borlet e-mailed Kochi, informed Kochi that he was a combat veteran with a service-connected disability, and attempted to schedule an in-person meeting with him.  Although Kochi was not willing to meet in person even though he had openings on his calendar, he did grant a brief phone interview to Borlet; rather than providing assistance or guidance, however, he told Borlet that he was aware of the situation but had been "trying to stay out of it." When Borlet mentioned that he

was no longer promotable because Condie had falsely communicated Borlet's reason for accepting the demotion, Kochi merely made an excuse to end the call, saying that he was needed in the CEO's office immediately.  Rather than engaging in the meaningful dialogue mandated of an employer by the ADA, Kochi sped through the phone interview, which lasted less than ten minutes, and took no further action.

54.    In July of 2019, Borlet had an informal dinner with James Condie. Among the topics discussed were the circumstances of Borlet leaving the MPS role, and the aftermath of his demotion from that position.  Borlet explained to Condie that it was very wrong that he was now blacklisted at BD. Condie asked Borlet to stop using the term "blacklisted" as it was it was a concern at BD. Borlet explained that since he was no longer promotable and his executive level training had been cancelled, it was the most appropriate term to use. Condie agreed with Borlet that his chances of a future promotion were remote but again asked that he not use the term "blacklisted." Borlet also detailed that BD's refusal to engage with him to attempt to reach a reasonable accommodation was not just against BD policy but against the ADA. Borlet then notified Condie that he was prepared to get the EEOC involved. Both Condie and Borlet agreed that it would be best if they could come to a compromise settlement agreement between Borlet and BD. During the rest of the dinner Borlet and Condie discussed business issues related

to key customers. At the end of the dinner, Condie thanked Borlet for the discussion and said that he would talk to Betty Larson, head of the Human Resources Department about a possible settlement agreement to keep Borlet from going to the EEOC

55.     Condie subsequently referred Borlet back to Thompson, the same HR executive who had refused to offer him a reasonable accommodation.  Thompson started the meeting with Borlet claiming that she was fighting behind the scenes on his behalf. During the discussion Thompson claimed that she went to the highest levels and said that it was wrong that Borlet had been told that he could not interview because he did not meet expectations when his review stated otherwise.  Thompson initially represented that any severance package would not need to include a non-compete restriction or any language limiting Borlet's ability to explain his departure to any future employer.   Moreover, when Borlet emphasized to her that it was extremely important to him that BD management learn lessons from his situation regarding both bullying and ADA compliance, Thompson responded that it could not go into the agreement but that BD was learning from this situation and would conduct more  training on the ADA and on bullying. When Borlet received the proposed severance package suggested by BD, in September of 2019, there was a twelve month non-compete clause and language restricting Borlet's ability to describe his departure.

56.     Borlet notified Thompson that he was still hopeful that they would reach a settlement but that he needed to file a complaint with the EEOC due to timeline requirements. Borlet filed a Charge of Discrimination with the Equal Employment Opportunity Commission on September 16, 2019, alleging retaliation and violations of the Americans with Disabilities Act.  Borlet also informed Thompson that his meeting with the EEOC representative was on December 24th and that he would cancel the meeting and complaint if they could reach a settlement.

57.     Borlet was then informed – after several months of having been given the exact opposite impression by both Thompson and Andreychak – that BD had found no bullying, no wrongdoing by Conroy or Polen, and that no additional training on ADA compliance would be given.  Borlet was given this shocking news by Claudia Curtis, Esq., Chief Employment Counsel at BD.  Borlet told Curtis that the proposed severance package was not acceptable, that BD had not negotiated with him in good faith, and that he felt that he had no option other than to pursue a complaint for discrimination and retaliation.

58.     Both before and after filing an EEOC complaint, Borlet has been retaliated against in a number of ways.

59.     At no time was Borlet offered a reasonable accommodation by BD, nor was he ever permitted to interview for an upper managerial position.  Instead, he was pressed to agree to the severance package proposed by BD, including its

restrictions on his future employment and freedom of speech.

60.     On September 30, 2019, Borlet reiterated to both Thompson and Gunderson that the proposed severance was not acceptable and that he was instead choosing to remain in his current role at BD.

61.     From September 30th through the remainder of 2019, Borlet continued to perform the duties and responsibilities of a Vice President without further incident. His 2019 performance review again found that he met expectations in his position. In spite of the "met expectations" finding, Borlet did not receive the full bonus or stock options for which he was eligible for the second year in a row.

62.     Whenever additional positions at the VP/GM level became open at BD, Borlet was not informed about them or permitted to interview for them, despite meeting the job qualifications and having more than ample experience and qualifications.

63.     On December 19, 2019, while on holiday vacation, Borlet received a phone call followed by an email from Thompson informing him that he was being terminated.  When asked for the reasons, Thompson stated that BD was accepting his June 2017 resignation – in spite of the fact that Borlet had never resigned and had, in fact, notified multiple people at BD that he was choosing to remain in his current position in spite of the lack of compliance with the requirements of the ADA by BD.  Borlet responded by reminding not only Thompson, but also

Gunderson and Polen that he had never resigned his position. Borlet also provided this information to the Chairman of the Board and Chief Executive Officer.

64.    Polen did not respond to Borlet at all, and Gunderson's sole response was to cancel meetings that would ordinarily have involved Borlet. Gunderson refused to speak to Borlet about the issue of his lack of resignation or the circumstances surrounding his termination, even though he was Borlet's direct supervisor.

65.    On January 22, 2020, Borlet had a telephone meeting with Thompson finalizing his termination by BD, which was now being characterized by BD as a termination against his will, rather than a resignation. Borlet remained on the payroll as an employee through January 24, 2020, but was not allowed to return to his office to collect his personal belongings or to say goodbye to any of his coworkers or subordinates.

## Count I
## Americans with Disabilities Act

66.    All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

67.    Plaintiff Borlet suffers from a "disability" as that term is defined in the ADA because Plaintiff has or had, at all times relevant hereto, PTSD, a mental impairment that substantially limits/limited one or more major life activities, or

because Plaintiff had a record of such an impairment.

68.     Plaintiff Borlet also suffers from a "disability" as that term is defined in the ADA because Plaintiff was regarded as and/or perceived by Defendant BD and its agents as having PTSD, a mental impairment that substantially limits/limited one or more major life activities.

69.     Plaintiff Borlet is a "qualified individual with a disability" as that term is defined in the ADA because he has, or had at all times relevant hereto, PTSD, a mental impairment that substantially limited/limits one or more major life activities, or because he had a record of such impairment.

70.     Plaintiff Borlet also is a "qualified individual with a disability" as that term is defined in the ADA because he was regarded as and/or perceived by Defendant BD and its agents as having PTSD, a mental impairment that substantially limited/limits one or more major life activities.

71.     Plaintiff Borlet is a "qualified individual with a disability" as that term is defined in the ADA because Plaintiff was able to perform all of the essential functions of the job, with or without a reasonable accommodation.

72.     The foregoing conduct by Defendant BD constitutes unlawful discrimination against Plaintiff on the basis of his disability or perceived disability.

73.     In retaliating against Plaintiff as result of his disability and/or perceived disability, Defendant violated the ADA.

74.    As a result of Defendant's unlawful discrimination, Plaintiff has suffered damages as set forth herein.

**WHEREFORE**, Plaintiff seeks the damages set forth in the *ad damnum* clause of this Complaint, *infra*.

### Count II
### <u>ADA – Retaliation</u>

75.    All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

76.    In complaining to Defendant about disability discrimination, the Plaintiff engaged in protected activity.

77.    The foregoing conduct by the Defendant constitutes unlawful retaliation against the Plaintiff.

78.    As a result of the Defendant's unlawful retaliation, the Plaintiff has suffered damages as set forth herein.

**WHEREFORE**, the Plaintiff seeks the damages set forth in the *Ad Damnum* Clause of this Complaint, *infra*.

### Count III
### <u>New Jersey Law Against Discrimination</u>

79.    All of the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at

length.

*80.*    The foregoing conduct by Defendants also violates the New Jersey Law Against Discrimination, N.J.S.A. § 10:5-1, *et seq.*

81.    As a result of Defendants' violations of the New Jersey Law Against Discrimination, Plaintiff has suffered damages, as set forth herein.

***WHEREFORE***, Plaintiff seeks the damages set forth in the *Ad Damnum* clause of this Complaint, *infra*.

## *AD DAMNUM* CLAUSE/PRAYER FOR RELIEF

***WHEREFORE***, the Plaintiff prays that the Court enter judgment in his favor and against the Defendant and that it enter an Order as follows:

a.    The Defendant is to be permanently enjoined from discriminating against the Plaintiff on the basis of his disability and/or any basis prohibited under applicable federal and state law;

b.    The Defendant is to be prohibited from continuing to maintain its illegal policy, practice, or custom of discriminating against employees based on their disability and is to promulgate an effective policy against such discrimination and to adhere thereto;

c.    The Defendant is to compensate the Plaintiff, reimburse the Plaintiff, and to make the Plaintiff whole for any and all pay and benefits the Plaintiff would have received had it not been for the Defendant's illegal actions, including but not

26

limited to back pay, front pay, salary, pay increases, bonuses, medical and other benefits, training, promotions, pension, stock options, and seniority. The Plaintiff should be accorded those benefits illegally withheld from the date he first suffered discrimination at the hands of the Defendant until the date of verdict;

d.  The Plaintiff is to be awarded actual damages, as well as damages for the pain, suffering, and humiliation caused to him by the Defendant's actions;

e.  The Plaintiff is to be awarded punitive damages as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish the Defendant for its willful, deliberate, malicious, and outrageous conduct, and to deter the Defendant or any other employees from engaging in such misconduct in the future;

f.  The Plaintiff is to be accorded any and all other equitable and legal relief as the Court deems just, proper, and appropriate;

g.  The Plaintiff is to be awarded the costs and expenses of this action and reasonable legal fees as provided by applicable federal and state law;

h.  Any verdict in favor of the Plaintiff is to be molded by the Court to maximize the financial recovery available to the Plaintiff in light of the caps on certain damages set forth in applicable federal law;

i.  The Plaintiff is to be granted such additional injunctive or other relief as he may request during the pendency of this action in an effort to ensure the

Defendant does not engage – or ceases engaging – in illegal retaliation against the Plaintiff or other witnesses in this action;

j.   The Court is to maintain jurisdiction of this action after verdict to ensure compliance with its Orders therein; and

k.   The Plaintiff's claims against the Defendant are to receive a trial by jury to the extent allowed by applicable law. The Plaintiff has also endorsed this demand on the caption of this Complaint in accordance with Federal Rule of Civil Procedure 38(b).

July 27, 2020

Respectfully submitted,

PARLATORE LAW GROUP

By: _____
Timothy C. Parlatore, Esquire
Maryam N. Hadden, Esquire
Parlatore Law Group
Attorneys for Plaintiff
One World Trade Center, Suite 8500
New York, NY  10007
(212)603-9918